# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| JAMES MCSWAIN, § | |
| § | |
| **Plaintiff** § | |
| § | |
| v. § | Civil Action No. 3:10-CV-1060-BH |
| § | |
| MICHAEL J. ASTRUE, § | |
| **Commissioner of Social Security,** § | |
| § | |
| **Defendant.** § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of reassignment dated July 28, 2010, this case has been transferred for the conduct of all further proceedings and the entry of judgment. Before the Court are *Plaintiff, James McSwain's, Motion for Summary Judgment*, filed October 27, 2010, and *Defendant's Motion for Summary Judgment*, filed November 23, 2010. Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **DENIED**, Defendant's motion is **GRANTED** and the final decision of the Commissioner is wholly **AFFIRMED**.

## I. BACKGROUND[1]

**A.     Procedural History**

Plaintiff James McSwain ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying his claim for disability benefits under Title II and Title VI of the Social Security Act. On July 19, 2006, Plaintiff applied for disability insurance benefits and supplemental security income, alleging disability since May 13, 2006, due

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "R."

to an artificial right leg below the knee, learning disorder, major headaches, high blood pressure, angina, enlarged liver, racing heart, and constant trembling. (R. at 11, 36-37, 137.) His applications were denied initially and upon reconsideration. (R. at 46-47, 53-54.) He timely requested a hearing before an Administrative Law Judge ("ALJ") and personally appeared and testified at a hearing held on August 29, 2008. (R. at 55, 19-35.) On September 18, 2008, the ALJ issued a decision finding Plaintiff not disabled. (R. at 11-18.) On February 24, 2010, the Appeals Council denied his request for review and the ALJ's decision became the final decision of the Commissioner. (R. at 3-5.) Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B.    Factual History**

    **1.    Age, Education, and Work Experience**

Plaintiff was born on March 28, 1964, was 42 years old on his alleged onset date, and was 44 years old at the time of the hearing before the ALJ. (R. at 90.) He has a ninth grade education and has past relevant work as an automobile mechanic and air-conditioner installer. (R. at 17, 229.)

    **2.    Medical Evidence**

On August 3, 2005, Plaintiff visited Hassan Farooq, M.D., for a physical examination at the request of the Texas Rehabilitation Commission. (R. at 226.) Dr. Farooq noted that Plaintiff had injured his leg in 1981 in a motorcycle accident and had a right leg amputation below the knee. (*Id.*) Plaintiff did not have an abnormality of the straight leg raise or any edema, cyanosis, clubbing or ulceration of the extremities, but he did have an abnormal, waddling, and drunken gait and a positive Romberg's sign. (R. at 227.) Plaintiff had difficulty tandem walking, difficulty walking on heels, difficulty walking on toes, and difficulty hopping, squatting, and arising from a squatting position.

(*Id.*) Plaintiff reported that he could lift about 20 pounds and could walk about half a mile before he had to stop due to the pressure on his right leg. (R. at 226.) Overall, Dr. Farooq opined that Plaintiff had gait problems and difficulty walking and appeared to have significant medical problems. (R. at 227.)

On August 14, 2005, Plaintiff saw Ronald Anderson, Ph.D., for a consultative psychological examination at the request of the Department of Assistive and Rehabilitative Services. (R. at 228-32.) His mental status examination revealed that his attention span and rote memory skill were poor and he needed extra time to concentrate and learn things, but once he learned something, he retained it well. (R. at 230.) Dr. Anderson opined that Plaintiff "should be able to learn to do routine repetitive jobs adequately." (*Id.*) His visual analysis and practical manipulation skills were fairly good, but his speed of performance with his hands was slow. (*Id.*) Dr. Anderson also opined that Plaintiff would "have difficulty performing adequately on tasks that demand speed and production with one's hands." (*Id.*) He further opined that Plaintiff's "ability to sequence events was fair, and he should be able to learn to do a tasks involving a short series of organized steps adequately". (*Id.*) He noted that while Plaintiff complained of depression, he did not indicate any serious problems with depression in the past and had never been hospitalized or treated for mental problems. (R. at 229.) He diagnosed Plaintiff with an adjustment disorder with depressed mood, reading disorder, mathematics disorder, learning disorder not otherwise specified, and borderline intellectual functioning. (R. at 231-32.) His prognosis was guarded, and he noted that Plaintiff had been able to maintain employment in spite of his intellectual and educational deficits but quit working because of physical health concerns. (R. at 232.)

On May 10, 2006, Plaintiff visited Hopkins County Memorial Hospital ("HCMH") for a physical examination. (R. at 324.) The attending physician noted that his extremities were non-

tender, and that he had a full range of motion, no pedal edema, and no motor or sensory deficits. (*Id.*) On July 12, 2006, Plaintiff visited Presbyterian hospital of Commerce ("PHC") for a physical examination. (R. at 508.) He was noted to have normal neurological and cerebral functioning and no motor or sensory deficits. (*Id.*) On August 1, 2006, Plaintiff visited Ladonia Medical Center ("LMC") for a physical examination, where he was noted to be well nourished and well developed with no acute distress, and no edema, clubbing or cyanosis. (R. at 340.) Plaintiff returned to LMC on August 31, 2006, and was again noted to have no edema, cyanosis, or clubbing. (R. at 383.)

On September 8, 2006, Michele Chappuis, Ph.D., a state agency psychological consultant, completed a mental residual functional capacity ("RFC") assessment of Plaintiff. (R. at 364-367.) She noted that Plaintiff was markedly limited in his ability to understand, remember and carry out detailed instructions, but was able to understand, remember, and carry out simple instructions, make simple decisions, concentrate for extended periods, interact with others, and respond to changes. (R. at 364-66.) Dr. Chappuis also completed a psychiatric review technique form (R. at 350-63), and noted in her assessment that Plaintiff had a learning disorder, a math disorder, a reading disorder (R. at 351), an adjustment disorder with depressed mood (R. at 353), borderline intellectual functioning (R. at 354), an alcohol abuse disorder, and polysubstance abuse disorder in remission (R. at 358).

On September 13, 2006, James Wright, M.D., a state agency medical consultant completed a physical RFC assessment of Plaintiff. (R. at 368-75.) He noted that Plaintiff could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand or walk about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday with normal breaks, could do unlimited pushing or pulling, and had no postural limitations in climbing, balancing, stooping, kneeling, crouching, and crawling. (R. at 369-70.) He opined that Plaintiff did not have any

manipulative, visual, communicative, or environmental limitations. (R. at 371-72.)

On October 28, 2006, Plaintiff returned to HCMH for a follow-up visit. (R. at 406.) He was noted to have normal neurological and cerebellar functioning, a full range of motion with no tenderness and no pedal edema in all extremities, and no motor or sensory deficits. (R. at 407.) On October 31, 2006, Plaintiff returned to LMC where he was again noted to have no edema, cyanosis, or clubbing. (R. at 386.) Plaintiff also visited PHC five times between December 29, 2006, and July 23, 2007, and on each visit was noted to have normal neurological and cerebellar functioning, a full range of motion with no tenderness and no pedal edema in all extremities, and no motor or sensory deficits. (R. at 444, 459, 471, 482, 495.)

On August 13, 2008, Darrel Horton, Ph.D., performed a psychological evaluation of Plaintiff upon referral from his attorney. (R. at 523-29.) Dr. Horton diagnosed Plaintiff with cognitive disorder, "rule out learning disorder", "rule out depressive disorder", and borderline intellectual functioning. (R. at 528.) He opined that Plaintiff was in the borderline range of measured intelligence with academic capabilities well below his intellectual level, with indications of a learning disability. (*Id.*) He also opined that Plaintiff was limited in his ability to understand and remember detailed instructions, carry out detailed instructions, perform at a consistent pace, deal with normal work stress, and complete a normal workday and workweek without interruptions from psychologically or neurocognitively based symptoms. (R. at 529.)

### 3. Hearing Testimony

On August 29, 2008, Plaintiff, two medical experts, and a vocational expert ("VE") testified at a hearing before the ALJ. (R. at 19-35.) Plaintiff was represented by an attorney. (R. at 19.)

#### a. Plaintiff's Testimony

Upon examination by his attorney, Plaintiff testified that his headaches started after he "was

hit broadside" in a motorcycle accident at age seventeen. (R. at 26.) The accident affected his leg and head and he "lost a few teeth." (*Id.*) In 2004, his headaches got worse after a roommate struck him on the side of his head and caused a concussion. (*Id.*) Because of his headaches, he sometimes saw spots, didn't sleep very well, and got "sidetracked a lot real bad." (R. at 28.) Even if his blood pressure was under control with medication, he still had headaches. (R. at 27.) He had memory problems and could not complete a task without asking for instructions two or even three times. (R. at 28.) After his amputation, he had been able to walk around for a while but could no longer walk more than one eighth of a mile and could only stand for 30 minutes at a time. (R. at 29.) He had not seen any doctors recently for that problem. (*Id.*) He relied on family and friends for financial support as well as for help with daily living. (*Id.*)

Upon cross-examination by the ALJ, Plaintiff testified that he had not worked since 2004, but had previously worked as a certified mechanic and air-conditioner installer. (R. at 31, 33.) He explained that he was afraid to go out in the heat, started seeing spots, and got nervous. (R. at 31.) Because he wasn't given any medication for his headaches, he used to drink beer to "kill the pain." (*Id.*) He had quit drinking about six months earlier after his friends and family cut off his alcohol supply; his headaches had gotten worse since then. (R. at 31-32.)

### b. *Testimony by Medical Experts*

Two medical experts – John Vorhies, M.D., and Alvin Smith, Ph.D.– testified at the hearing. (R. at 22-25.) Dr. Vorhies testified that Plaintiff had a "right below knee amputation" many years ago, but because he had ambulated effectively for many years with a prosthesis, his impairment did not meet or equal a listing. (R. at 22.) He opined that Plaintiff had no other severe impairments, and his RFC was limited to medium work which precluded heavy lifting. (R. at 22-23.) He testified that Plaintiff's blood pressure was easily controlled with medication and therefore not severe. (R. at 23.)

Even though it was difficult to evaluate his headaches, they appeared to be non-severe as well. (*Id.*) He visited the emergency room with a headache while intoxicated on numerous occasions, and a headache could be a side effect of alcohol. (*Id.*)

Dr. Smith testified that Plaintiff had some cognitive limitations; he functioned at the borderline intellectual functional range and had limited academic development at the third grade level with a full IQ range between 75 and 78. (R. at 24.) He also testified that there was some mention of depression in Plaintiff's medical record, but he did not see it as severe. (*Id.*) Plaintiff had mild restrictions of daily living, moderate limitations in concentration, persistence, or pace, and no episodes of decompensation for an extended duration. (*Id.*) Dr. Smith restricted Plaintiff from performing complex tasks but opined that Plaintiff could perform tasks higher than just simple one and two step tasks. (R. at 24-25.) Plaintiff, in his view, could do better with hands-on things that he could learn through experience, practice, and repetition, as opposed to some language-based process. (R. at 25.)

### c. *Vocational Expert's Testimony*

The VE testified that Plaintiff's past relevant work as an automobile mechanic was medium and skilled, and his work as an air-conditioner installer was heavy and skilled. (R. at 33.) The ALJ asked the VE to opine whether a hypothetical individual with the following capabilities could perform Plaintiff's past relevant work: lift or carry 50 pounds occasionally and 25 pounds frequently; sit 6 hours per day; stand or walk 6 hours per day; understand, remember, and follow simple detailed instructions; and complete simple and detailed tasks. (R. at 33-34.) The VE opined that the hypothetical individual could not perform Plaintiff's past relevant work, but could perform other medium and unskilled work such as the work of a warehourse worker, dishwasher, and laundry worker. (R. at 34.) When the ALJ limited the hypothetical individuals's capabilities to light work,

with an ability to walk or stand only 30 minutes at a time, an ability to remember and follow simple and detailed instructions, and an inability to sustain an 8-hour day or 40-hour workweek on a consistent basis, the VE opined that the individual could not perform any work. (*Id.*)

C.  **ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on September 18, 2008. (R. at 11-18.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since May 13, 2006, the alleged onset date. (R. at 12, ¶ 2.) At step two, he found that Plaintiff had the severe impairments of "status post amputation of the right leg," borderline intellectual functioning, and depression. (R. at 13, ¶ 3.) At step three, he found that Plaintiff did not have an impairment or a combination of impairments that met or equaled a listed impairment. (R. at 13, ¶ 4.) In his RFC assessment, the ALJ found that Plaintiff had "the ability to understand, remember and follow simple and detailed instructions and complete simple and detailed tasks," and had the capacity to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), except that he could lift and/or carry 50 pounds occasionally and 25 pounds frequently, sit 6 hours in an 8-hour workday, and stand and/or walk 6 hours in an 8-hour workday. (R. at 14, ¶ 5.) He found that Plaintiff was unable to perform his past relevant work, but given his age, education, work experience, and RFC, could perform other jobs existing in significant numbers in the economy. (R. at 17-18, ¶¶ 6-10.) He concluded that Plaintiff had not been disabled since the alleged onset date through the date of his decision. (R. at 18, ¶ 11.)

## II. ANALYSIS

A.  **Legal Standards**

   1.  **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.*

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). The Commissioner utilizes a sequential five-step inquiry to determine whether an adult is disabled and entitled to benefits under the Social Security Act:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.

*Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

B.     **RFC Findings**

Plaintiff presents only one issue for review – that the ALJ's RFC findings are not supported by substantial evidence. (Pl. Br. at 1, 4, 7.)

Residual functional capacity is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1) (2003). Residual functional capacity "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). To perform the full range of a certain level of work, a person must be able to perform all or substantially all of that range of work. SSR 83-10, 1983 WL 31251, at *6 (S.S.A. 1983).

"The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). An ALJ may consider an individual to have no limitation or restriction with respect to a functional capacity when there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction. SSR 96-8p, 1996 WL 374184, at *1. An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. *Id*. An ALJ's decision can be supported by substantial evidence even if the ALJ does not specifically discuss all evidence that supports his decision or all evidence that was rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). However, the ALJ must explain his decision. *Id*.

Substantial evidence exists when there is enough relevant and sufficient evidence as a

reasonable mind might accept as adequate to support a conclusion. *See Leggett*, 67 F.3d at 564. Even if the reviewing court would reach a different conclusion based on the evidence in the record, the court must defer to the ALJ if there is substantial evidence to support his conclusion. *Id.* Nevertheless, this standard of review is not simply an uncritical "rubber stamp" and "involves more than a search for evidence supporting the" ALJ's decision; the reviewing court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984). A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *Johnson*, 864 F.2d at 343.

1. **Physical RFC**

In challenging the ALJ's physical RFC finding, Plaintiff argues that his leg amputation prevents him from doing the walking, standing, and other postural activities required of a full range of medium work. (Pl. Br. at 4-7.)

The regulations define medium work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." *See* 20 C.F.R. §§ 416.967(c), 404.1567(c). "A full range of medium work requires standing or walking, off an on, for a total of approximately 6 hours in an 8-hour workday." SSR 83-10, 1983 WL 31251, at *6 (S.S.A. 1983). "The considerable lifting required for the full range of medium work usually requires bending-stooping," which in turn requires flexibility of the knees and the torso. *Id.* Being on one's feet for most of the workday is critical for most medium jobs. *Id.*

The ALJ found that Plaintiff retained the RFC to perform medium work, except that he could

"lift and/or carry 50 pounds occasionally and 25 pounds frequently, sit 6 hours in an 8-hour workday, and stand and/or walk 6 hours in an 8-hour workday." (R. at 14, ¶ 5.) In making this finding, he discussed the medical evidence of record, including Dr. Farooq's opinion that Plaintiff had gait problems and difficulty walking, hopping, squatting, and arising from a squatting position. (R. at 15.) The ALJ pointed out, however, that during his visit with Dr. Farooq, Plaintiff reported that he could cook, clean, dress, drive and feed himself, and was able to lift twenty pounds and walk about half a mile before stopping due to the pressure on his right leg. (*Id.*) The ALJ also pointed out that Plaintiff had no difficulty with coordination, "no abnormality of the straight leg raise bilaterally," and no edema, cyanosis, clubbing, or ulceration. (*Id.*)

The ALJ also considered the opinion of Dr. Wright, a state agency medical consultant, who opined that Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently and could sit, stand, and/or walk 6 hours in an 8-hour workday with unlimited ability to push and pull. (R. at 16.) Finally, the ALJ considered the testimony of Dr. Vorheis, the medical expert, who testified that Plaintiff had ambulated effectively for many years despite a prosthetic right leg, and found Dr. Wright's RFC opinion reasonable in light of the medical evidence of record. (*Id.*) The ALJ then accepted the opinions of Dr. Wright and Dr. Vorheis, finding them consistent with Plaintiff's RFC and with each other. (*Id.*)

Plaintiff argues that the ALJ improperly accepted the opinions of a state agency medical consultant and a medical expert over the opinions of an examining physician. (Pl. Br. at 4-6.) As determined by the Fifth Circuit, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *See Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). The evidence considered by the ALJ here showed that Plaintiff had ambulated effectively for many

years with prosthesis, could walk half a mile before needing to stop due to the pressure in his right leg, had no clubbing, cyanosis, edema, or ulceration in his extremities, full range of motion with non-tenderness in all extremities, and no pedal edema in all extremities. (R. at 226-27, 324, 369-70, 383, 386, 407, 444, 459, 471, 482, 495.) The evidence before the ALJ, moreover, did not include any complaints during the relevant period about Plaintiff's leg impairments. Finally, while Dr. Farooq observed in August of 2005 that Plaintiff had gait problems and difficulty walking and hopping, his observations were made approximately nine months before the alleged onset date and were therefore of limited relevance. *See Carmickle v. Comm'r of Social Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008) (medical opinions predating the alleged onset of disability are of limited relevance).

Plaintiff also argues that the ALJ's RFC finding did not accommodate postural limitations from his amputation, such as climbing, balancing, kneeling, crouching, and crawling. (Pl. Br. at 6-7.) There is no evidence in the record, however, that Plaintiff could not climb, balance, kneel, or crouch with his prosthetic leg. Additionally, Dr. Farooq did not identify any of these postural limitations in his report, and observed only that Plaintiff had difficulty squatting and arising from a squatting position. (R. at 227.) As noted, if there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the ALJ may properly consider a claimant to have no limitation or restriction with respect to that functional capacity. SSR 96-8p, 1996 WL 374184, at *1.

Plaintiff further argues that the ALJ's RFC finding did not accommodate his October 2006 statement that his artificial leg was worn out and he could not afford a new one. (Pl. Br. at 5.) This

failure, he asserts, violates the principle set out in *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) that if a "claimant cannot afford the prescribed treatment or medicine, and can find no way to obtain it, the condition that is disabling in fact continues to be disabling in law." (*Id.*) While Plaintiff filed a personal statement in October 2006 that he needed a new leg, he never reported to a physician that he needed a new leg, and no physician opined that he needed a new one. Even assuming that his statement alone was sufficient to demonstrate that need, he has not provided any evidence to show that he lacks access to free or low-cost medical services. *See id.* (condition disabling in law if a "claimant cannot afford prescribed treatment or medicine, *and* can find no way to obtain it") (emphasis added). Accordingly, the requirement that a claimant's inability to pay for medical treatment be considered does not apply in this case.

2. **Mental RFC**

Plaintiff also challenges the ALJ's mental RFC finding – that Plaintiff had the "ability to understand, remember, and follow simple and detailed instructions and complete simple and detailed tasks." (Pl. Br. at 7-9.)

Plaintiff argues that despite the ALJ's acknowledgment of his borderline intellectual functioning and depression as severe impairments, his mental RFC finding only placed a limitation on his ability to understand, remember, follow, or complete "complex" instructions. (*Id.* at 7.) There was substantial evidence in the record, however, to find that Plaintiff was only restricted from performing complex tasks. A state agency psychologist, Dr. Chappuis, opined that Plaintiff could understand, remember, and carry out simple instructions, make simple decisions, concentrate for extended periods, and respond to changes. (R. at 364-66.) Dr. Anderson, another psychologist, stated that Plaintiff's attention span and rote memory skill were poor and he needed extra time to

concentrate and learn things, but opined that once Plaintiff learned something, he retained it well and "should be able to learn to do routine repetitive jobs adequately." (R. at 230.) He also opined that Plaintiff's "ability to sequence events was fair, and he should be able to learn to do tasks involving a short series of organized steps adequately" (*Id.*) He further noted that while Plaintiff complained of depression, he did not indicate any serious problems with depression in the past and had never been hospitalized or treated for mental problems. (R. at 229.) His prognosis was guarded and he pointed out that Plaintiff had been able to maintain employment in spite of his intellectual and educational deficits. (R. at 232.) The medical expert, Dr. Wright, also testified that Plaintiff should be restrained from work that required complex tasks but he could still complete tasks higher than mere one and two-step instructions. (R. at 24.)

Plaintiff also argues that the ALJ should have given more weight to Dr. Anderson's opinion that he would have difficulty performing adequately on tasks demanding speed and production with one's hands. (Pl. Br. at 8-9.) Proper consideration of this opinion, he maintains, would preclude him from working as a warehouse worker, a laundry worker, and a kitchen helper. (*Id.*) The ALJ was not required to accept that opinion, however, because it constituted pre-onset evidence, and other objective medical evidence during the relevant time period showed normal neurological and cerebellar functioning, normal coordination, no motor or sensory defects in all extremities, and no manipulative limitations. (R. at 324, 371, 407, 444, 459, 471, 482, 495, 508.) Additionally, since Dr. Anderson is a psychologist, his opinion on Plaintiff's physical impairment was not entitled to any special deference, especially since he did not support it with any objective diagnostic tests or clinical findings. *See* 20 C.F.R. §§ 404.1527(d)(5), 416.927(d).

Remand is not required because the ALJ's physical and mental RFC findings are each

supported by substantial evidence.

## III. CONCLUSION

Plaintiff's motion for summary judgment is **DENIED**, Defendant's motion for summary judgment is **GRANTED**, and the final decision of the Commissioner is wholly **AFFIRMED**.

**SO ORDERED,** on this 25th day of January, 2011.

*[signature]*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE